[No. 209-41430-3. Division Three. October 16, 1970.]

EVERGREEN IMPLEMENT, INC., *Respondent*, v. RALPH PLANK *et al., Appellants.*

*Darrell E. Ries* (of *Ries & Kenison*), for appellant.

*Ken Earl* and *Charles T. Schillberg,* for respondent.

GREEN, J.—Plaintiff, Evergreen Implement, Inc., (hereinafter called "Evergreen") and defendants, Ralph Plank and Janet Plank, his wife (hereinafter called "Plank"), brought this action for specific performance of a contract for the

sale of certain real estate. From a judgment granting specific performance, defendants appeal.

Evergreen was engaged in the business of selling farm machinery near Othello. The business was conducted on real estate owned by Plank. Ralph Plank was president of the corporation and owned 51 per cent of the stock; Roger Thieme, an employee, owned 49 per cent. Donald Rizzuti and Garth Lybbert were also employees. In early 1968, all of these parties entered into a series of agreements whereby the stock owned by Plank would be sold to the three employees and the real estate would be sold to the corporation.

On January 15, 1968, Plank, as seller, and Evergreen, as purchaser, executed the contract for sale of the real estate for $70,000. The purchase price was to be paid (1) by a downpayment of $21,000; and (2) the balance of $49,000 plus interest to be paid at the rate of $569 "or more" per month, commencing February 1, 1968. It was filed for record on January 26, 1968. The contract contained the usual provisions including forfeiture, at seller's option, on default. Evergreen's performance was guaranteed by the three employees—Thieme, Rizzuti and Lybbert.

The record shows the stock sale agreements[1] were executed in January but the terms were not to be implemented until the end of the corporation's fiscal year, February 29, 1968. At that time, the three employees paid to the closing attorney the downpayment required under these agreements. Plank refused to deliver the stock certificates into escrow, claiming he sold too cheaply, needed more security and that Thieme (not a party to this action) misrepresented Evergreen's financial condition. Before Plank would conclude the stock sale, it was necessary to change the stock sale agreements and prepare a 5-party default agreement.[2] All of these agreements were executed on

---

[1]The stock sale agreements contained provisions for forfeiture, at the seller's election, on default.

[2]After identifying the real estate contract and the stock sale agreements, the 5-party agreement provided:
3. All parties agree that if there is a default in any one or more

April 23, 1968, effective April 1, 1968. These agreements, together with the real estate contract and deed were placed in escrow.

On December 12, 1968, Evergreen secured sufficient funds to pay off the real estate contract and tendered payment to Plank. The tender was renewed on December 19, 1968. Thereupon, Plank withdrew the contract and deed from escrow and through his attorney notified Evergreen the prepayment would not be accepted. This letter of refusal stated:

> . . . the five-party agreement of April 1, 1968 makes the real estate contract and the stock sale contracts mutually dependent and that there exists no right . . . to pay off any one without paying them all. The property held as security for one contract is, in effect, held for security of all of the contracts.

Thereafter, Evergreen brought this action for specific performance, depositing the balance owing on the contract into court.

Plank contends the trial court erred in (1) holding the 5-party agreement lacked consideration and was unenforceable; and (2) in finding the "five-party agreement was restricted to procedures to be followed on the condition that a default occurred." For reasons that will become apparent, it is unnecessary to discuss the first contention.

Plank takes the position the 5-party agreement integrated the real estate contract and the stock sale agreements so that each became security for the other. It is argued that to allow prepayment of the real estate contract and delivery of the deed would destroy that security if the purchasers defaulted on the stock sale agreements. We disagree. The real estate contract provided for payments of $569 per month "or more" and the stock sale agreements

---

of the said contracts, the same shall constitute a default in the remaining agreements described herein and made a part hereof, and the Seller shall have the right, under the terms of said individual contracts, and this contract, to notify the various parties of said default and follow such remedies as Seller is given in said contracts. This agreement was signed by Evergreen, Plank, Thieme, Rizzuti and Lybbert.

with each employee provided for annual payments in fixed amounts "or more." It was conceded by counsel during oral argument that under the terms of the agreements as written, the maturity dates do not coincide and the sellers would be obligated to deliver the deed or the stock certificates when each was paid in the normal course of minimum payments. Consequently, at some point in time the security would be destroyed by normal payment. The only issue is whether the time for delivery of the deed can be accelerated beyond the normal maturity date.

 The contracts in this case expressly provide for prepayment by fixing the amount of each payment and adding the words "or more." We have searched the entire record and have read all of the agreements between the parties. Construing all of the agreements together, we find nothing that prohibits Evergreen's right of prepayment. The agreement is not ambiguous. The trial court was correct when it held the 5-party agreement was limited to procedures on default. The purchaser in this case has not defaulted; it merely wants to accelerate payment of the balance due. Our function is to enforce agreements, not rewrite them. *Grant County Const'rs v. E. V. Lane Corp.*, 77 W.D.2d 107, 118, 459 P.2d 947 (1969); *Nowoj v. Mulalley*, 1 Wn. App. 939, 943, 465 P.2d 194 (1970).

Judgment affirmed.

EVANS, C. J., and MUNSON, J., concur.